**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 24-cr-17 (APM)** |
| **v.** | : | |
| | : | |
| **JONATHAN BONNEY,** | : | |
| | : | |
| **Defendant** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the Government requests that this Court sentence Defendant Jonathan Bonney to six months' incarceration, one year of supervised release, and $500 restitution.

## I.     Introduction

Defendant Jonathan Bonney, 40 years old, operates the Wilderness Walk Zoo in Hayward, Wisconsin. He participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the Government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the Government has sought restitution based on a case-by-case evaluation.

On March 11, 2024, Bonney pleaded guilty to violations of: (1) entering and remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1); (2) disorderly and disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2); (3) disorderly conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); and (4) parading, demonstrating, or picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). Bonney pled open to all counts in the Information, and there was no agreement with the Government at the time of his plea.

The Government's recommendation is supported by Bonney's conduct before, during, and after January 6, which included: (1) texting multiple people in the days before January 6, 2021 about his plans to go to the U.S. Capitol and join "the massive [T]rump rally at the capital [sic] building on January 6 for the electoral count!!", adding before that, "if something crazy happens, I wanna be part of it!"; (2) texting others and asking if "any of you other fuckers down to go say fuck the democrats"; (3) once at the U.S. Capitol on January 6, repeatedly walking past obvious signs that the U.S. Capitol building and grounds were restricted; (4) just before entering the U.S. Capitol building, texting multiple people that,  "We're storming the capital!!!"; (5) entering the U.S. Capitol building through a door that had visibly broken glass, after watching other rioters push that same door open; (6) once inside the U.S. Capitol building, proceeding as far as the entrance to the Speaker's Lobby before deciding to exit the building; and (7) in the days after January 6, sending messages to various people that showed no regret or remorse for his actions. Shortly after January 6, Bonney messaged a group of people that "I'm not ashamed of how it went down…they needed a wake up call and hopefully they got it." On that same thread, Bonney messaged "I was ready to go in and hang [P]elosi with a noose from the balcony."

The Court must also consider that Bonney's conduct on January 6, like the conduct of

scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Bonney's crime support a sentence of six months' incarceration, one year of supervised release, and $500 restitution.

## II.    Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid unnecessary exposition, the Government refers to the general summary of the attack on the U.S. Capitol provided in an earlier filing with the Court. *See* paragraphs 1-7 of the *Government's Factual Resume, Maximum Penalties, and Proposed Elements for Change-of-Plea Hearing*. ECF 31.

### Defendant Bonney's Role in the January 6, 2021 Attack on the Capitol

On December 27, 2020, Bonney communicated with multiple people by text message and wrote, "Just bought my ticket to DC for the massive [T]rump rally at the capital [sic] building on January 6th for the electoral count!" Around that same time, Bonney sent another text that read, "That's why I'm showing up for this final protest…if something crazy happens, I wanna be part of it!" In the days leading up to January 6, 2021, Bonney also sent messages encouraging others to join him at the Capitol, asking on one group thread, "Any of you other fuckers down to go say fuck the democrats?"

On January 5, 2021, Bonney flew from his hometown of Grand Junction, Colorado to Baltimore, Maryland, then went to Washington, D.C. where he spent the night in a hotel near the U.S. Capitol Building. On the morning of January 6, Bonney walked around the Ellipse and Washington Monument, taking photographs and videos of protestors. Bonney then walked to the

U.S. Capitol Building. At approximately 2:28 p.m., Bonney was standing outside the east side of the U.S. Capitol Building wearing a green camouflage baseball hat that read, "MAKE AMERICAN GREAT AGAIN," a gray jacket, jeans, and tan boots as depicted in Image 1. Around this same time, Bonney sent a text message to a group thread that read, "We're storming the capital!!!"



**Image 1**

Closed Circuit Video ("CCV") footage showed that Bonney, while on the east side of the U.S. Capitol Building, looked through a glass pane on a locked door, motioning for rioters inside to open the door as depicted in Image 2.



**Image 2**

At 2:41 p.m., CCV footage showed other rioters who were already inside the Capitol building force the door open, and Bonney entered the Capitol through the opened door, as depicted in Image 3.



**Image 3**

CCV footage then showed Bonney walking west down a hallway of the U.S. Capitol building, as depicted in Image 4.



**Image 4**

After parading through the Capitol building for around 12 minutes, at approximately 2:53 p.m., Bonney exited the U.S. Capitol Building through the same door he had used to enter, as depicted in Images 5 and 6.



**Image 5**



**Image 6**

On January 7, 2021, Bonney flew from Washington-Dulles airport back to his hometown of Grand Junction, Colorado. Shortly after returning to Colorado, Bonney sent a text message to another group thread that read, "Shit was insane … I was ready to go in and hang Pelosi with a noose from the balcony," and, "I'm not ashamed of how it went down … they needed a wakeup call and hopefully they got it."

Following his arrest, Bonney consented to a search of his cellphone which contained video he took while inside the U.S. Capitol building—eventually making it all the way to the Speaker's Lobby. Not only is this a sensitive location, but Bonney was there at a pivotal time, just after a rioter attempting to enter the House Chamber was shot and killed (*see* Image 7).



**Image 7**

Bonney's phone also contained a number of text messages, videos, and photos dated on or about January 6, 2021. They showed that Bonney had planned to come to Washington, D.C. to protest the certification of the electoral vote, and that he even tried to recruit friends/family to come with him. Bonney's text messages also show that he intended to enter the U.S. Capitol Building on January 6, 2021. Most alarmingly, instead of being shaken by what he saw that day

or ashamed of his own behavior, in the days following the riot, Bonney's text messages contained references to acts of violence against members of Congress.

Finally, multiple Bonney text message exchanges from on or around January 6 revealed that several of his friends and family strongly advised Bonney against going to, entering, or otherwise participating in the attack on the U.S. Capitol Building that day. None of those text messages show that Bonney has any regret or remorse for his actions on January 6, 2021.

*Bonney's FBI Interview*

On January 25, 2021, Bonney was interviewed by FBI agents at his home. After providing some basic background and demographic information to the agents, Bonney ended the interview and stated that he would not agree to an interview without an attorney present. Bonney did not provide any information related to January 6, or his conduct at the U.S. Capitol building. Bonney was not interviewed again.

*The Charges and Plea Agreement*

On January 8, 2024, the United States Attorney's Office for the District of Columbia charged Bonney by a four-count Information with violating 18 U.S.C. § 1752(a)(1); 18 U.S.C. § 1752(a)(2); 40 U.S.C. § 5104(e)(2)(D); and 40 U.S.C. § 5104(e)(2)(G). On March 11, 2024, Bonney pleaded guilty to all four counts of the Information, without a plea agreement.

**III.    Statutory Penalties**

Bonney now faces sentencing for the four counts of conviction. The statutory penalties for those offenses are set forth at ¶¶ 96 and 97 of Bonney's PSR.

**IV.    The Sentencing Guidelines and Guidelines Analysis**

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49

(2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

### Count One: 18 U.S.C. § 1752(a)(1)—Entering and Remaining in a Restricted Building or Grounds

The U.S.S.G. Statutory Appendix lists two guidelines for a Section 1752 offense: U.S.S.G. § 2A2.4 (Obstructing or Impeding Officers) and § 2B2.3 (Trespass). Here, U.S.S.G. § 2B2.3 is the most appropriate guideline for 18 U.S.C. § 1752(a)(1).

| Base Offense Level: | 4 | U.S.S.G. §2B2.3(a) (Trespass) |
|---|---|---|
| Specific offense characteristic | +2 | U.S.S.G. §2B2.3(b)(1)(A)(vii): the trespass occurred "at any restricted building or grounds." On January 6, 2021, the U.S. Capitol and grounds were restricted because protectees of the United States Secret Service were visiting. *See* 18 U.S.C. § 1752(c)(1)(B). |
| Total | 6 | |

### Count Two: 18 U.S.C. § 1752(a)(2)—Disorderly and Disruptive Conduct in a Restricted Building or Grounds

The U.S.S.G. Statutory Appendix lists two guidelines for a Section 1752 offense: U.S.S.G. §2A2.4 (Obstructing or Impeding Officers) and §2B2.3 (Trespass). Here, 18 U.S.C. § 1752(a)(2) involves conduct beyond mere trespass, thus §2A2.4 is more appropriate. *See United States v. Nassif*, 97 F.4th 968, 983 (D.C. Cir. 2024).

| Base Offense Level: | 10 | U.S.S.G. §2A2.4(a) (Obstructing and Impeding Officers) |
|---|---|---|
| Total | 10 | |

**Counts Three and Four: 40 U.S.C. § 5104(e)(2)(D) and (G)—Disorderly conduct in a Capitol building and parading, demonstrating or picketing in a Capitol building**

Counts Three and Four are Class B misdemeanors to which the Sentencing Guidelines do not apply. *See* 40 U.S.C. § 5109(b); 18 U.S.C. § 3559(a)(7); U.S.S.G. § 1B1.9.

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. While the Government concedes that Section 4C1.1 applies to Bonney, the Court should nevertheless vary upward by two levels to account for the reduction under 4C1.1. An upward variance is necessary because the January 6 riot was a violent attack that threatened the lives of legislators and their staff, interrupted of the certification of the 2020 Electoral College vote count, did irrevocable harm to our nation's tradition of the peaceful transfer of power, caused more than $2.9 million in losses, and injured more than one hundred police officers.

Every rioter, whether or not they personally engaged in violence or personally threatened violence, contributed to this harm. *See, e.g., United States v. Rivera*, 21-cr-60 (CKK), ECF No. 62 at 13 ("Just as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood. Only when all of the floodwaters subside is order restored to the field. The same idea applies in these circumstances. Many rioters collectively disrupted congressional proceedings and each individual rioters contributed to that disruption. Because [the defendant's] presence and conduct in part caused the continued interruption to Congressional proceedings, the court concludes that [the defendant] in fact impeded or disrupted the orderly conduct of Government business or official functions"). Thus, Bonney's conduct caused a significant disruption to a vital Governmental function, warranting an upward variance. *See United States v. Eicher*, No. 22-cr-

038 (BAH), Sent'g Hrg. Tr. at 48 (varying upward by two levels to offset the Section 4C1.1 reduction).

Although the provision took effect after January 6, 2021, the Sentencing Commission enacted § 4C1.1 based on recidivism data for offenders released in 2010. *See* U.S. SENT'G COMM'N, RECIDIVISM OF FEDERAL OFFENDERS RELEASED IN 2010 (2021), available at: https://www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010. Given the unprecedented nature of the Capitol attack, there is no reason to believe this historical data is predictive of recidivism for defendants who engaged in acts of political extremism on January 6. This is particularly so given the degree to which individuals, including defendants who have been sentenced, continue to propagate the same visceral sentiments which motivated the attack. *See, e.g.*, *United States v. Little*, No. 21-cr-315 (RCL), ECF No. 73 at 4 ("The Court is accustomed to defendants who refuse to accept that they did anything wrong. But in my thirty-seven years on the bench, I cannot recall a time when such meritless justifications criminal activity have gone mainstream.").

The U.S. Probation Office calculated Bonney's criminal history as a category I. PSR at ¶ 45. Accordingly, the U.S. Probation Office calculated Bonney's total adjusted offense level, after acceptance, at 6 (PSR at ¶ 42), and his corresponding Guidelines imprisonment range at zero to six months. PSR at ¶ 98.  If §4C1.1 applies, and the Court does not vary or depart, his final guidelines range would nonetheless be 0-6 months. *See* U.S.S.G. §5 Pt. A

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the Government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to

Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

**V.     Sentencing Factors Under 18 U.S.C. § 3553(a)**

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of six months' incarceration and one year of supervised release.

**A.  The Nature and Circumstances of the Offense**

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Bonney's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Bonney, the absence of violent or destructive acts is not a mitigating factor. Had Bonney engaged in such conduct, he would or could have faced additional criminal charges.

One of the most important factors in Bonney's case is his clear intent—evidenced not only by his conduct at the Capitol but in his multiple communications with others before, during, and after the riot—to participate in the disruptive events of January 6. Bonney is not someone who came to D.C. to peacefully protest as part of the former President's rally and was then somehow swept up in the fervor of the crowd.  Rather, he went to D.C. to make sure that if something "crazy"

happened, he would be "part of it."  And "part of it," as Bonney saw it, was to harm legislators and disrupt Congress. That premeditated plan to see chaos is a substantial aggravator here. Moreover, in the days after the crime, Bonney felt justified in his actions. In other words, when millions of Americans recoiled in horror at what happened at the seat of their legislature, Bonney stood proud**.** That level of dissidence is alarming.

### B.  Bonney's History and Characteristics

Bonney is currently employed and resides in Hayward, Wisconsin.  He has no prior criminal convictions. Bonney served in the United States Army from 2003 until 2015, when he was honorably discharged as a Sergeant First Class.

While Bonney's military service is laudable, it renders his conduct on January 6 all the more troubling. As a former military non-commissioned officer, Bonney was well aware that he did not have permission or authority to enter a restricted Government building. His voluntary decision to storm a guarded Government building is disturbing in light of his former military service and training. As an active-duty service member he would not have allowed civilians onto restricted military installations. In this case, Bonney's conduct and former military service demonstrates a very real need for specific deterrence in the form of incarceration.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on

our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President, regardless of how hard fought the race was, is, or will be. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The need to provide specific deterrence to this particular defendant also weighs heavily in favor of a term of incarceration. First, as discussed above, in the days leading up to January 6, Bonney expressed a specific desire and intent to go to the U.S. Capitol and participate in violence. Not only did Bonney's family and friends decline to join him at the Capitol, they strongly advised

him not to go to the Capitol on January 6. and also told him via text that day he should "be careful," "get out of the capital [sic] Jon," "[d]on't try to break into the capital [sic] Jonathan," and "Jonathan don't you go in that building!"

Moreover, Bonney does not appear to have taken any steps to denounce his words and actions on January 6, 2021. Although Bonney ultimately pled guilty to all four counts in the Information, the Government is not aware of any instances of Bonney expressing guilt, remorse, or regret about his actions and conduct related to January 6. With the 2024 presidential election approaching, the potential for a repeat of January 6 looms ominously. The Court must sentence Bonney in a manner sufficient to deter him specifically, and others generally, from going down that road again.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the Government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[2] This Court must sentence Bonney based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Bonney has pleaded guilty to all four counts of the Information which, among other things, charges him with disorderly and disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2). This offense is a Class A/B misdemeanor. 18 U.S.C. § 3559. The

---

[2] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the Government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the exact same balance of aggravating and mitigating factors present here, other judges of this court have sentenced Capitol breach defendants who spent time in other sensitive places within the Capitol. A defendant's entry into a sensitive space, such as the Speaker's Lobby, places that defendant in a more serious category of offenders than defendants who remained in more public spaces, such as the Rotunda. A defendant who entered a sensitive space took an extra step to occupy the Capitol and displace Congress and to display the dominance of the mob over the will of the people. That person's presence is even more disruptive. An unauthorized individual in a private office poses a greater threat and creates a greater impediment to members of Congress and staffers just trying to do their jobs than would a trespasser passing through a hallway.

In *United States v. Eric Clark*, 22-cr-409 (APM), which also involved a defendant entering a sensitive area within the Capitol building (a Senator's office), this Court found that such conduct was serious and warranted incarceration. In making this determination, this Court noted that—in addition to his serious conduct—Clark had shown no remorse for his actions, even at sentencing. After Clark was convicted of four offenses: 18 U.S.C. § 1752(a)(1) and (a)(2) and 40 U.S.C. § 5104(e)(2)((D) and (e)(2)G), this Court imposed five months of incarceration and twelve months of supervised release.  Like Clark, Bonney entered a sensitive area within the Capitol building. Also like Clark, Bonney has shown no remorse for his actions on January 6. What sets Bonney

apart from Clark and warrants the slightly higher sentence the Government requests here are Bonney's inflammatory statements before, during, and after the assault on the Capitol on January 6, suggesting that a greater risk of recidivism than existed for Clark.

In *United States v. Jeffrey Smith*, 21-cr-290 (RBW), the defendant took videos of himself while entering the Capitol building (shouting "We ain't going take it" and "Let's fucking go patriots") and proceeded deep into the building. While Smith engaged in more openly aggressive or forceful conduct than Bonney while at the Capitol, the Government did not offer evidence of Smith making inflammatory statements before and after January 6. Here, Bonney made multiple statements, to multiple individuals, before, during, and after the January 6 assault on the Capitol, that demonstrate both a clear intent to participate in the riot and a complete lack of remorse. Like Bonney, Smith was former active-duty military. Judge Walton imposed three months incarceration and two years of supervised release.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## VI.     Restitution

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C.  § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). Because Bonney pled guilty to a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a  result of" the  offense  of  conviction. *Hughey v.*

*United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the Government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[3]

Because Bonney engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and [his or her] criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold Bonney responsible for [his or her] individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "Government was unable to offer anything more than 'speculation' as to [the

---

[3] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment."). *cf*. 18 U.S.C.  § 3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the court … may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.").

More specifically, the Court should require Bonney to pay $500 in restitution for his plea to all four counts of the Information. This amount fairly reflects Bonney's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, five hundred dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where Bonney was convicted of only misdemeanors and not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

### VII.    Fine

Bonney's plea to violations of 18 U.S.C. § 1752(a)(1); 18 U.S.C. § 1752(a)(2); 40 U.S.C. § 5104(e)(2)(D); and 40 U.S.C. § 5104(e)(2)(G) subjects him to a statutory maximum fine of $100,000 for Count One, $100,000 for Count Two, $5,000 for Count Three, and $5,000 for Count Four. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider Bonney's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023).

The burden is on Bonney to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

Here, Bonney has not shown an inability to pay, thus pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e). The guidelines fine range here is $500 U.S.S.G. § 5E1.2(c).

Under § 5E1.2(d), courts shall consider:

(1) The need for the combined sentence to reflect the seriousness of the offense (including the harm or loss to the victim and the gain to the defendant), to promote respect for the law, to provide just punishment and to afford adequate deterrence;

(2) Any evidence presented as to the defendant's ability to pay the fine (including the ability to pay over a period of time) in light of his earning capacity and financial resources;

(3) The burden that the fine places on the defendant and his dependents relative to alternative punishments;

(4) Any restitution or reparation that the defendant has made or is obligated to make;

(5) Any collateral consequences of conviction including civil obligations arising from the defendant's conduct;

(6) Whether the defendant previously has been fined for a similar offense;

(7) The expected costs to the Government of any term of probation, or term of imprisonment and term of supervised release imposed; and

(8) Any other pertinent equitable considerations.

U.S.S.G. § 5E1.2(d). *See* 18 U.S.C. § 3572(a).

## VIII.   Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the Government recommends that this Court sentence Bonney to six months' incarceration, one year of supervised release, and $500 restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Bonney's liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crimes.

<div style="margin-left:40%">

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    */s/ Elizabeth N. Eriksen*
ELIZABETH N. ERIKSEN
Trial Attorney, Detailee
VA Bar No. 72399
United States Attorney's Office
District of Columbia
601 D Street, N.W.
Washington, DC 20001
(202) 616-4385
Elizabeth.Eriksen2@usdoj.gov

*/s/ Benjamin J. Smith*
BENJAMIN J. SMITH
Assistant United States Attorney
N.Y. Bar Number 5220637
United States Attorney's Office
District of Columbia
601 D Street, N.W.
Washington, D.C. 20530
(202) 304-0977
Benjamin.smith4@usdoj.gov

</div>